HAMILTON v. LUDLOW. See Case No. 8,-052.

HAMILTON (MUTTER v.). See Case No. 9,-974.

## Case No. 5,986.

### HAMILTON v. MUTUAL LIFE INS. CO.

[9 Blatchf. 234; 5 Am. Law T. Rep. U. S. Cts. 30; 1 Ins. Law J. 573; 6 Am. Law Rev. 578; 3 Bigelow, Ins. Cas. 787.][1]

Circuit Court, S. D. New York. Dec. 22, 1871.

LIFE INSURANCE—NON-PAYMENT OF PREMIUMS BY REASON OF WAR — EFFECT OF WAR ON EXECUTORY CONTRACT BETWEEN CITIZENS OF THE NATIONS AT WAR.

1. In March, 1858, a mutual life insurance company of New York issued to G. a written policy on his life. G. was, at the time, a citizen of, and a resident in, Alabama, and continued to be such until his death in June, 1866. The policy was for life, subject to the payment of an annual premium on or before a specified day, and contained a provision, that, in case G. should not punctually pay such premium, the policy should cease and determine, and all previous payments made thereon should be forfeited to the company. In due season, in March, 1859, 1860 and 1861, G. paid to M., an agent of the company at Mobile, Alabama, the accruing premiums, and they were received by the company at New York. Afterwards, and in March, 1861, the company withdrew all their agencies from Alabama, and had no agent in that state until 1869. G., after 1861, paid no further premiums on the policy. He was always ready to pay, but did not pay because of the revocation of the agencies, and because the insurrection against the government of the United States prevented lawful intercourse between Mobile and New York. The restrictions against intercourse continued until May, 1865. Afterwards, and before March, 1866, G. applied to the company at New York, to receive the premiums in arrear, with interest. It refused to do so or to recognize the policy as subsisting. The plaintiff, as executor of G., renewed the application, but it was refused, on the ground that the policy was forfeited. He then filed this bill, praying for a decree declaring the policy to be subsisting and not forfeited, and directing the payment of the amount insured by it, less the unpaid premiums and interest thereon. *Held*, that the plaintiff was entitled to such decree.

[Cited in Bird v. Pennsylvania Mut. Ins. Co., Case No. 1,430.]

[Cited in Cohen v. New York Mut. Life Ins. Co., 50 N. Y. 610.]

2. An executory contract of continuing performance, made before the breaking out of a war, with an alien enemy, if it cannot be performed except in the way of commercial intercourse with the enemy, is ipso facto dissolved by the declaration of war, which operates, for that purpose, with a force equivalent to that of an act of congress.

3. Where a contract is of such a character that its continued existence is not dependent

1 [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission. 6 Am. Law Rev. 578, contains only a partial report.]

upon any further intercourse between the parties, the only effect of the war is to suspend its operation, and, on the return of peace, the rights of the parties under it may be enforced.

[Cited in Cohen v. New York Mut. Life Ins. Co., 50 N. Y. 623; Sands v. New York Life Ins. Co., Id. 636.]

4. The policy of life insurance, in this case, was suspended, but not dissolved, during the continuance of the war between the United States and the insurrectionary states, of which latter Alabama was one, and New York was not one, in so far as G. could not pay the accruing annual premiums without commercial intercourse between Alabama and New York.

5. The contract was not one of continuing performance, in the sense of the rule before stated, so as to be dissolved by the war.

6. The policy was not unlawful, as continuing to insure the life of G., although he was an alien enemy, it appearing that he was a neutral, passive, non-combatant enemy, who remained such in fact.

[Cited in Sands v. New York Life Ins. Co., 50 N. Y. 638.]

7. On the facts of this case, it was a part of the contract of the company, that G. should have the right to pay the annual premiums to an agent of the company in Alabama, and the company was bound to provide in Alabama, during the continuance of the risk on the policy, an agent to receive such premiums, appointed and qualified in compliance with the statute law of Alabama on the subject, and G. was not bound to pay such premiums elsewhere than to such agent. As the absence of such agent was all that prevented the payment of the premiums by G., the company cannot set up, as a defence, the non-payment of the premiums at the stipulated times.

8. The agency of M., having been created before the war, would not have been revoked by the war, at least so far as the right to receive payment of annual premiums was concerned.

9. Payment of the premiums by G. to the agent, would not have violated any law of war, or any duty of G.'s.

10. The refusal of the company, when applied to by G., to recognize the policy or receive the premiums, made it unnecessary for him to pay the premium due in March, 1866.

[Cited in Mutual Benefit Life Ins. Co. v. Hillyard, 37 N. J. Law, 457; Worthington v. Charter Oak Life Ins. Co., 41 Conn. 388; Dillard v. Manhattan Life Ins. Co., 44 Ga. 119; Martine v. International Life Ins. Society of London, 53 N. Y. 343.]

11. It is of the essence of every contract, that, if one party to it prevents its performance by the other party, the former cannot be allowed to reap any benefit from the fact of such non-performance.

12. The inability of the company to receive the premiums, because of the unlawfulness of commercial intercourse, was equivalent to a tender of the premiums and a refusal to receive them, or to a waiver of their punctual payment.

13. There is a sound distinction between cases in which the impediment to the performance of a precedent condition, on which, by contract, money is to be paid, exists solely on the part of him who is to be the actor in performance, and cases in which the impediment exists either solely on the part of him who is to be the recipient of performance, or is an impediment affecting both parties jointly, and equally in extent.

14. Although the company was a mutual company, the policy was not dissolved by the war, as a contract of partnership between enemies.

[This was a bill in equity, brought by Peter Hamilton, as sole acting executor of the will of Duke W. Goodman, deceased, against the Mutual Life Insurance Company of New York.]

Charles F. Sanford, for plaintiff.
Henry E. Davies, for defendants.

BLATCHFORD, District Judge. The plaintiff is a citizen of Alabama. His testator was, during all the period covered by the transactions in this case, a citizen of Alabama, residing and domiciled therein, and the defendants are a corporation created by the state of New York.

The defendants, by their proper officers, made a written contract with Duke W. Goodman, the plaintiff's testator, dated March 24th, 1858. The contract was what is commonly known as a policy of life insurance. It was signed by the officers of the corporation, and made in its name, and was not signed by Goodman, but was delivered to and accepted by him. The material provisions of the policy are these: "This policy of insurance witnesseth, that the Mutual Life Insurance Company of New York, in consideration of the representation made to them in the application for this policy, and of the sum of one hundred and seventy-seven dollars and fifty cents to them in hand paid by Duke W. Goodman, and of the annual premium of one hundred and seventy-seven dollars and fifty cents, to be paid on or before the second day of March in every year during the continuance of this policy, do assure the life of the said Duke W. Goodman, of Mobile, in the county of Mobile, state of Alabama, in the amount of five thousand dollars, for the term of his natural life." There is then a stipulation on the part of the company to pay the sum insured to the assured, his executors, administrators or assigns, in sixty days after due notice and proof of interest (if assigned or held as security) and of the death of the assured. There is then a declaration that the policy is accepted by the assured on certain express conditions, that, in case the assured shall, without the consent of the company, previously obtained and endorsed on the policy, pass beyond certain specified limits, or visit certain specified parts of the United States, or be or reside in certain specified places, or do certain specified things, or die from certain specified causes, the policy shall be null, void and of no effect. Then follows this provision: "It is also understood and agreed, by the within assured, to be the true intent and meaning hereof, that, * * * in case the said Duke W. Goodman shall not pay the said annual premium on or before the day hereinbefore mentioned for the payment thereof, then, and in every such case, the said company shall not be liable for the payment of the sum assured, or any part thereof, and this policy shall cease and determine;

and it is further agreed by the within assured, that, in every case where this policy shall cease, or become or be null or void, all previous payments made thereon shall be forfeited to the said company." At the foot of the policy, on its face, were these words, in print: "Agents of the company are authorized to receive premiums when due, but not to make, alter or discharge contracts or waive forfeitures." On the back of the policy were these words, in print: "Receipts heretofore by the company of premiums after the day on which they fell due, were by the assured and the company considered acts of grace or courtesy, and as forming no precedent in regard to future payments of premiums on the policy; and all future receipts of the company of premiums after due, are viewed and understood by the parties in interest, as acts of courtesy of the company, and in no case to be considered a precedent, or a waiver of the forfeiture of the policy, according to the conditions expressed therein, if any future payment of premiums be omitted on the day it falls due."

The defendants had, on the 2d of March, 1849, issued to the wife of the said Duke W. Goodman, a policy for $5,000 on the life of her husband, subject to the annual premium of $177.50, on an application made February 28th, 1849, when Mr. Goodman was 37 years of age. The defendants are organized on the mutual plan, and made, under their charter, a dividend on the 1st of February, 1853, whereby there was added to the policy in favor of Mrs. Goodman, the sum of $415.37 at that date, as a principal sum in which Mr. Goodman's life was insured, subject to all the terms of the policy, in addition to, and in like manner as, the $5,000, but without any addition of premium to be paid. On the 1st of February, 1858, a like dividend was made, whereby the further sum of $567.68 was added to the same policy, as a like principal sum. These dividends were sums of money representing excesses of premium paid by Mrs. Goodman beyond what was found to be necessary to be retained by the company in respect of its risk on the policy, and were applied by the company, on behalf of Mrs. Goodman, to the purchase for her, of paid up insurances with the company, on the same life, in the principal sums so added to the policy. But, although no increased premium beyond the $177.50 was payable in respect to these additions, or in respect of the policy by reason of these additions, such premium of $177.50 was annually payable in respect of the whole policy, embracing the $5,000 and the additions, the additions being placed upon the same footing with the $5,000, in respect to all the stipulations of the policy, in like manner as if they had been part of a sum in which the life insured was insured at the inception of the policy, at the annual premium of $177.50. These added sums were at the risk of the policy, with the $5,000, and recoverable from and payable by the

company, at the death of Mr. Goodman, only if the $5,000 was recoverable and payable. Under this state of facts, the policy in favor of Mrs. Goodman was surrendered to the defendants, and they accepted its surrender, and, in place of it, issued the policy of the 24th of March, 1858. It bore the same number as the policy of March 2d, 1849, and appears to have been regarded as a continuation of it, with only the change as to the recipient of the sum insured at the death of Duke W. Goodman, for the defendants transferred to it, and endorsed upon it, as sums insured by it, the said several sums of $415.37 and $567.68, which had been so added to the policy of 1849.

On the 2d of March, in each of the years 1859, 1860, and 1861, Mr. Goodman paid to Thomas W. McCoy, the agent of the defendants at Mobile, the sum of $177.50, as the annual premium mentioned in the policy. For the payments of 1859 and 1860, he was furnished, on each occasion, with a receipt signed, on behalf of the company, by its secretary, dated at the office of the company in New York, and countersigned by McCoy, as agent. The receipt of 1859 specifies the sum paid as renewing the policy "from the 2d day of March, 1859, to the 2d day of March, 1860." The receipt of 1860 specifies the sum paid as renewing the policy "from the 2d day of March, 1860, to the 2d day of March, 1861." On the margin of each one of the receipts of 1859 and 1860, were these words, in print: "N. B. The agreement is mutual (see application and policy), that, unless the premium is paid on or before the day it becomes due, the policy is forfeited and void." For the payment of 1861, Mr. Goodman received a receipt signed by McCoy, as agent of the company, and dated Mobile, March 2d, 1861, specifying the sum paid as the renewal premium on the policy "from date unto 2d day of March, 1862." The payment of March 2d, 1861, was remitted by McCoy to the defendants at New York, and was received by them there by March 26th, 1861. Afterwards, and on that day, the defendants, by their president, addressed a letter from New York, to McCoy, at Mobile in which they said: "On full examination of the Alabama law of 24th February, 1860, we come to the conclusion that we cannot comply with its provisions, and therefore feel obliged to withdraw all our agencies from the state. We write to each policy holder to remit premiums directly to us in future. Will you be kind enough to address them for us, as we cannot tell where the parties now live. Our assured are not covered against actual warfare of any description, whether it be by collision with the Northern states or any other power. This does not apply to non-combatants." McCoy was the principal agent of the company in Alabama. They had other agents in that state. After sending such letter of March 26th, 1861, the company had no agent in Alabama until some time in the year 1869. Mr. Goodman died

at Mobile, June 6th, 1866. He had not made any payment of the annual premium on the policy after the payment made March 2d, 1861.

Under these circumstances, the bill in this case is filed, setting forth, that, on the 2d of March, 1862, and on every 2d of March thereafter during his lifetime, Mr. Goodman "was ready and willing to pay the several annual premiums, as the same respectively became payable," "but that he did not, on or after the 2d of March, 1862, pay said annual premiums or any or either of them, because the agency of the said McCoy, as the said Goodman was informed and believed, had been theretofore revoked, and no one else had been substituted as such agent in his place and stead, and because the then existing insurrection and rebellion against the government of the United States had interrupted and prevented all lawful intercourse, by mail or otherwise, between the city of Mobile, where the said Duke W. Goodman resided and then was, and the city of New York, where the said company resided and had its office and place of business;" that, on the 16th of August, 1861, under the authority of the act of congress of July 13th, 1861 [12 Stat. 255], the president of the United States, by proclamation, declared that the inhabitants of the state of Alabama were in a state of insurrection against the United States; that all commercial intercourse between the state of Alabama and the inhabitants thereof, and the citizens of other states, was, and would remain, unlawful, until such insurrection should have ceased or been suppressed, and that all goods, chattels, wares and merchandise coming from the said state of Alabama into other parts of the United States, without the special license and permission of the president, would be forfeited to the United States; that such restrictions and prohibitions and liabilities to forfeiture continued until May 22d, 1865, and that, until the proclamation of the president, issued on the 2d of April, 1866, the inhabitants of the state of Alabama could have had no standing in this court; that, immediately after the removal of the prohibition of intercourse, Mr. Goodman applied to the company at New York, to receive from him whatever of such annual premiums might be found in arrear, together with interest thereon, and offered to do whatever he was bound to do for the preservation or restitution of his rights under the policy, but the defendants refused to entertain such proposal and denied that Goodman had any rights in the premises; that, after such refusal, Goodman died; that the plaintiff, immediately after his appointment as executor, caused application to be made to the company, at New York, to receive from him whatever of the annual premiums might have been in arrear at the time of the death of Goodman, together with interest thereon, and offered to pay the same, or to abate the same from the

amount of the policy, and to do whatever else he was required to do, and gave notice, and offered to make due proof, of the death of Goodman, but the company refused to receive said premiums, or to accept such proof, or to pay said policy, or the additions thereto, or any part thereof; that the company pretends that the policy was forfeited by the non-payment of premium; that any other compliance than as aforesaid with the terms and conditions of the policy, was, without any act or default of Goodman, suspended and prohibited, and rendered impossible; and that it is contrary to equity and good conscience that a forfeiture of his valuable rights should be worked thereby. The prayer of the bill is, that the rights of Goodman, and of the plaintiff, as his executor, under the policy, may be decreed to be valid and subsisting, and not to have been lost by forfeiture or otherwise, the plaintiff being ready and willing, and offering, to pay to the company, all such sums of money, together with interest thereon, as may appear to the court to be justly and equitably due for premiums on the policy; that the company may be enjoined from asserting any forfeiture of the policy or of the rights of the assured, or of the plaintiff, under the same; and that the defendants may be decreed to pay to the plaintiff the amount thereby assured, with such additions thereto as have accrued and been made or credited to Goodman under the same.

The answer avers, that, if Goodman had been ready and willing to pay the annual premiums falling due March 2d, 1862, and thereafter, it would have been unlawful for him to have made such payments, and equally unlawful for the defendants, after the 16th of August, 1861, to have received such payments and continued the policy in force; that no payment has been made on the policy, to the defendants, since the 2d of March, 1861; that none was offered or tendered to be made until after June, 1865; that the policy expired and ceased to exist, by its terms, on the 3d of March, 1862; that, at the time the policy was issued to Goodman, Thomas W. McCoy was the agent of the defendants at Mobile, in and for the state of Alabama; that the appointment of McCoy as such agent, in and for said state, was revoked by the defendants in March, 1861; that Goodman had notice thereof; that since that time the defendants have not had any agent in and for the state of Alabama; that the citizens of the state of Alabama, and that state, on the 12th of April, 1861, rebelled against and instituted a civil war against, the government of the United States, and organized a government in hostility thereto; that thereupon all the citizens and inhabitants of that state, and the said Goodman, a citizen and resident thereof, became and were from thenceforth alien enemies, and so continued to be up to and until the cessation of said hostilities, in May, 1865; that the restric-

tions and prohibitions and liabilities to forfeiture declared by the proclamation of August 16th, 1861, continued until the 22d of May, 1865; that, after the 16th of August, 1861, and before the 22d of May, 1865, it was unlawful for the defendants to insure the life of Goodman, or to receive from him, or credit him with, any premium on the policy; and that such state of insurrection and war, of itself, terminated the policy, and all the rights and interests of Goodman or his assigns therein, and also terminated his membership of said company, and all his rights and privileges as a member thereof, and all right thereafter to participate in the investments, earnings and profits thereof.

The third section of the act incorporating the defendants provides, that "all persons who shall hereinafter insure with the said corporation, and also their heirs, executors, administrators and assigns, continuing to be insured in said corporation, as hereinafter provided, shall thereby become members thereof, during the period they shall remain insured by said corporation, and no longer." The thirteenth section of the same act provides, that "any member of the company who would be entitled to share in the profits, who shall have omitted to pay any premium, or any periodical payment, due from him to the company, may be prohibited by the trustees from sharing in the profits of the company, and all such previous payments made by him shall go to the benefit of the company." On the 22d of February, 1848, a resolution was adopted by the board of trustees of the company, providing, "that any member of the company who would be entitled to share in the profits, who shall have omitted to pay any premium or periodical payment due from him to the company, shall not share in the profits of the company, and all previous payments made by him or her shall enure to the benefit of the company."

The principle of law on which the defendants contend that the war terminated the existence of the policy, is the familiar one, that an executory contract of continuing performance, made before the breaking out of a war, with an alien enemy, if it cannot be performed except in the way of commercial intercourse with the enemy, is, ipso facto, dissolved by the declaration of war, which operates, for that purpose, with a force equivalent to that of an act of congress. The William Bagaley, 5 Wall. [72 U. S.] 377, 407; Hanger v. Abbott, 6 Wall. [73 U. S.] 532, 536; Esposito v. Bowden, 4 El. & Bl. 963, and 7 El. & Bl. 763; Reid v. Hoskins, 4 El. & Bl. 979. Assuming that Goodman could not pay the annual premiums on the policy without commercial intercourse with the defendants at New York, he being a resident citizen of Alabama, the argument is that the policy was executory; that the vital principle of the contract is the payment of the annual premium by Goodman, and the consequent liability of the company to pay the amount insured, in case of the death of Goodman during the period covered by the payment of premium; that the continued existence of the policy depended on the punctual payment of the premium, every year, by Goodman; that, by the express terms of the policy, the non-payment of the premium relieved the defendants from liability; that, in this respect, the contract was executory, and its continued existence absolutely demanded continued intercourse and dealings between the parties; and that the contract is, therefore, brought within the very definition of the authorities, as an executory contract, of continuing performance.

Where a contract is of such a character that its continued existence is not dependent upon any further intercourse between the parties, the only effect of the war is to suspend its operation, and, on the return of peace, the rights of the parties under it may be enforced. In the case of Manhattan Life Ins. Co. v. Warwick, 20 Grat. 614, in March, 1871, the court of appeals of Virginia, by a majority of three judges against two, held, that a policy of life insurance, in a like situation with the one at bar, in the particulars involved in the question now under consideration, was suspended, but not dissolved, during the continuance of the late Civil War. The view taken by the majority of the court was, that the contract was altogether executory on the part of the company, in the sense that they had done nothing yet towards the performance of it on their part; that it had, however, been largely executed on the part of the assured, creating a right which could be defeated only by a default on his part; that this right was a right to the insurance, not merely for one year, but for the life of the assured; that a new contract every year was not necessary to give the right, but only the annual payment of the premium was necessary to prevent the divesting of the right; that the principle, that war dissolves the contract, had not been applied in a single instance to a contract made before the war, and executed by one of the parties, in part, before the war, and where the execution of the contract on his part was to be completed before he was entitled to any performance by the other party, or where the dissolution of a contract made before the war would work a forfeiture; that such an application of the rule would be arbitrary, unreasonable and immoral; that, when the contract is made before the war, but not executed by either party, and the carrying it into execution will involve a violation of the duty of the parties respectively to their countries, in the new relations which the war has created, in that case, its execution not having been entered upon, and it being uncertain how long the war may last, and prevent the execution of the contract, it may be dissolved, and this not to the prejudice of the parties, or either of them, but for their presumed convenience and benefit, to be absolved from the obliga-

tion of a contract, which, in the changed relations of their countries, cannot be carried into execution; that, on the other hand, if the contract is partly executed, and rights under it have vested, and it cannot be dissolved without loss or forfeiture to one of the parties, and it cannot be carried into execution consistently with the duty of the parties to their countries respectively, while the war lasts, in such case, it should not be dissolved, but only suspended; and that, if it can be carried into execution, notwithstanding the war, without conflicting with the obligation of allegiance of either party, it will be neither dissolved nor suspended.

In respect to a policy of life insurance in like situation, the court of appeals of Kentucky, in the case of New York Life Ins. Co. v. Clopton, 7 Bush. 179, in August, 1870, adopted the view, that the policy of the law does not avoid, because of the intervention of war, a pre-existing valid contract, which a single act, such as the payment of a debt, can perform; that, in such cases, a suspension of remedy during the war is the only effect of the war; that both principle and policy dissolve a contract made before the war for continuing performance, such as partnership, or affreightment; that the policy of interdicting the payment of a debt, is, that it may aid the enemy in the prosecution of hostilities; that, consequently, suspension of performance until the restoration of peace, effectuates the whole aim of the law, without dissolving the contract, which may be ultimately enforced in perfect consistency with the principle of the temporary interdict; that, in that class of cases, it is the contract, and not the performance, that is continuing, and a suspension of the remedy, and not a dissolution of the contract, is all that is necessary, befitting or just; that, in such cases as partnership and affreightment, the performance is continuous and unremitting, until the end of the contract shall have been consummated; that, therefore, as supervening war between the parties disables them from performing any of the incumbent duties, and defeats the object, of the contract, a dissolution of the contract is the natural and legal effect of the war; that the reason for dissolution in these two classes of cases is inapplicable to contracts which may be performed by a single act, or by periodical acts, between which there is nothing to perform, and, consequently, no continuity of performance; that, between a single act and such periodical acts, there is no apparent difference, in reason or principle; that, therefore, the law, which only suspends the remedy in the one case, cannot consistently dissolve the contract in the other; that, according to this definition, the ordinary contract of insurance does not seem to belong to the class of contracts of continuing performance, so as to be dissoluble because of an intervening war; that, in the case then before the court, the insurance was an executed entirety for the prescribed term, and the only performance which could devolve on the insurer was to pay the stipulated amount, in the event of loss insured against, fulfilment of which was not a continuing act, but a single act of a continuing contract; that the consideration, though payable in annual instalments, was, also, an entirety, and full performance was not of the kind technically styled continuing; and that, consequently, the war did not dissolve the contract on any such ground as that on which it would have dissolved a contract of partnership or affreightment.

I have dwelt somewhat at length on the views taken by the Virginia and Kentucky courts, in the cases referred to, because they are the only cases on the question of the effect of the late war in respect to the dissolution or non-dissolution of a contract of life insurance, where it is assumed that the payment of the annual premiums required intercourse with the enemy, which have met my notice. I have no hesitation in saying, that I concur fully in the conclusions of those courts on the question, and in the views, above set forth, on which those conclusions are founded. Even if the policy be regarded, for the purposes of this question, as containing a contract on the part of the assured to pay the annual premiums, though a contract not enforceable by a suit to be brought by the insurer, but enforceable only through the pressure of the stipulation for forfeiture in case of the non-payment of such premiums at the specified times, and even though, to pay such premiums, requires intercourse with the enemy, yet the case is one where a suspension of performance on the part of the assured will effectuate, as respects the belligerent governments, the whole aim of the law, without dissolving the contract. As regards the obligation of the insurer, the contract was not one at all of continuing performance, although it was a continuing contract. All that the insurer had to do under it was to pay the sum insured, in case a loss insured against should occur, and the annual premiums had been duly paid, and the proper proofs of such loss were furnished.

There would seem to be no principle on which it could be held, that, in this case, the war dissolved and abrogated this policy, which would not require the court to hold equally, that the policy would have been abrogated by the war, if Goodman had died after the 16th of August, 1861, and before the 2d of March, 1862. In such case, Goodman having been alive on the 16th of August, 1861, the court would be asked to hold that the rights of the parties were to be determined according to their status at the time the proclamation of that date was issued, and that, although Goodman had punctually paid all previously accruing premiums, and had died without making default, yet, the contract being one contracting for continuing performance by him in paying premiums annually, it was abrogated by the war on the

16th of August, 1861, so that the insurer was released from liability on it. A decision to that effect would shock every sense of justice. Yet it can make no difference that Goodman did not happen to die before the 2d of March, 1862. If the principle is to be applied to this policy at all, it must be applied as of the 16th of August, 1861. If it is not applied as of that date, it cannot be applied as of any other date. Its applicability cannot be made to depend on the question whether, in fact, Goodman survived, after the 16th of August, 1861, until after it became necessary for him to do an act of performance under the contract.

There is another suggestion which seems to me of great force. In all the cases, so far as I have observed, where the doctrine of abrogation has been applied to a contract of continuing performance, requiring, for such performance, intercourse with the enemy, the question arose on ground taken by the defendant in the suit, when sued for the breach of, or to enforce, some stipulation of the contract, which could be enforced against him by suit, that he was absolved from such stipulation by the dissolution of the contract through the operation of a war. The present case is not such a one. The defendants cannot, in respect of their obligation under the policy, set up, as a defence against the payment of the sum insured, the dissolution of such obligation by the war, any more than the maker of a promissory note, given before the war, could set up, after the end of the war, that his obligation to pay the note was abrogated by the war. In respect of the stipulation in regard to the payment of annual premiums, this is not a suit to enforce such stipulation or any liability under it, and the party who was, by the contract, to make such payments, does not set up, as a defence against an obligation to make them, a dissolution of the contract by the war.

It is further insisted, on the part of the defendants, that, if it is unlawful to insure the property of an alien enemy, it is, a fortiori, unlawful to insure the life of an alien enemy; that such an insurance could not lawfully be made during the existence of a war; that the acceptance of a renewal premium is virtually a new insurance, the obligation of the insurer lasting only for the period for which the premium is paid; that it matters not whether the alien enemy bears arms in the contest, or is merely a member of the hostile community; that the insurance of the life of an alien enemy gives aid and comfort to the enemy; and that, if it were to be held that the life of the plaintiff's testator, and the lives of many others similarly situated, continued to be insured after the breaking out of the war, under policies made before it broke out, then, if the persons insured had died during the war, the amounts or values of the policies would have been property capable of being used by the enemy of the United States in aid of the war

against it, because certain to be realized and made available after the termination of the war.

It is not to be conceded, that, under the policy in this case, the acceptance of a renewal premium would have been a new insurance. But, an examination of the cases and text books on the subject of the dissolution by war of contracts of insurance made before the war, shows, that the principle on which the rule rests does not extend to avoiding policies insuring property which is exempted by the laws of war from liability to be seized by the government of the insurer's country. While the rule would avoid a policy insuring the life of one who should become an actual and active enemy of such government, it thus acquiring the right to destroy his life, it would not affect the validity of an insurance on the life of a neutral, passive, non-combatant enemy, who remained such in fact, and over whose life there is no belligerent power, on the part of the government of the insurer. Though, by his domicil, he is a technical enemy, so that his property may be lawfully captured as enemy property, yet, as such nominal hostility does not subject his life, like his property, to peril, no belligerent right is affected by continuing the validity of the insurance. "Consequently, in such a case," as is said in New York Life Ins. Co. v. Clopton, before cited, "neither authority nor principle would avoid the policy, any more than if it had insured the life of a child in the cradle, or insured property exempt from capture or confiscation." Nor is it perceived how the amount or value of a policy on the life of an alien enemy who dies during the war, can be availed of, to aid the war, by the government of the country of the assured, in any way or to any extent in or to which the amount or value of a promissory note made before the war, and falling due during the war, cannot be availed of, to aid the war, by the government of the country of its holder, while its maker continues to be an alien enemy. Yet it was never heard that the obligation to pay a note was, under such circumstances, or for such reasons, abrogated by a war.

The bill alleges that Goodman was not concerned, directly or indirectly, in bringing on the insurrection and rebellion mentioned in the bill; and that he did not bear arms against the United States during the continuance of such insurrection and rebellion, nor in any way, directly or indirectly, aid or abet the enemies of the United States. The evidence is, that Goodman did not favor secession as a measure of redress for alleged wrongs; that he did not bear arms against the United States; that he was enrolled among the citizens of Mobile for home defence, but was not called into service; that he paid the taxes and assessments which were levied upon him and his property by the power which ruled the state of Alabama; that he contributed to the relief of sick and

wounded soldiers, and of the families of absent soldiers; that he held no office, during the war, under any government; that he was over the age for field service in the army, or was otherwise exempted from such service, and was not conscripted, and furnished no substitute for the army; and that he pursued the occupations of civil life during the war. On these facts, it cannot be held that any rule of law requires that the policy on the life of Goodman should be regarded as having been dissolved and abrogated by the war.

I have assumed, in the discussion hitherto, that Goodman could not, after the 16th of August, 1861, have paid to the defendants the annual premiums which accrued before the 22d of May, 1865, without direct intercourse with them. The fact is so. The bill alleges that Goodman failed to pay such premiums on or after the 2d of March, 1862, "because the agency of the said McCoy, as the said Goodman was informed and believed, had been theretofore revoked, and no one else had been substituted as such agent in his place and stead." The answer alleges, that the appointment of McCoy, as the agent of the defendants at Mobile, in and for the state of Alabama, was revoked by the defendants on or about the 26th of March, 1861, and Goodman had notice thereof, and since that time the defendants have not had any agent in and for the state of Alabama. The statements of the bill and the evidence show that these allegations of the answer are true, and that the defendants had no agent in Alabama from March, 1861, up to January, 1869. In the absence, therefore, of any agent of the defendants in Alabama, it was impossible for Goodman to pay his annual premiums without direct intercourse with the defendants at New York.

The defence is also set up, that the policy, by its terms, ceased to exist by reason of the non-payment of the annual premium that was due and payable on the 2d of March, 1862, and that thereby, also, all previous payments made by Goodman became forfeited to the defendants. It is replied, on the part of the plaintiff, to this defence, that the defendants, by the act of withdrawing all their agencies from the state of Alabama in March, 1861, prevented the payment by Goodman of his annual premiums, and thereby waived such payments, all of which became due after the 16th of August, 1861, the act of the defendants having prevented the payments in Alabama, and the effect of the war being to make such payments at New York, by Goodman, unlawful.

If it was a part of the contract entered into by the defendants, or of their obligations to Goodman under it, that Goodman should have the right to pay his annual premiums to an agent of the defendants in Alabama, and if the defendants were bound to provide in Alabama, during the continuance of the risk on the policy, an agent to receive such

premiums then Goodman was not bound to seek any other recipient of such payments than such agent, and was not bound, for want of any such agent, to pay the premiums directly to the defendants at New York. In the application made in February, 1849, for the policy issued to Mrs. Goodman in March, 1849, Goodman is described as residing in Mobile, Alabama, and as being a wharfinger there. In his application of March, 1858, for the policy of 1858, and in that policy, he is described as of Mobile, in the state of Alabama. All the premiums that he paid, were with the knowledge of the defendants, paid at Mobile, to McCoy, their agent there, and were received by the defendants through and from McCoy. Goodman resided in Mobile from 1835 up to his death, and died at Mobile. In the absence of any notice to the contrary, the defendants must be held to have continued to understand that he continued to reside in Mobile. His application for the policy of 1858 was made through McCoy, at Mobile, the policy was delivered to him through the hands of McCoy, at Mobile, and bears McCoy's signature, as agent at Mobile, the three payments of premiums in 1859, 1860 and 1861, were made through McCoy, at Mobile, and the receipts therefor bear the signature of McCoy as the defendants' agent. The policy contains on its face the words: "Agents of the company are authorized to receive premiums when due, but not to make, alter, or discharge contracts, or waive forfeitures." It is contended by the defendants that there was no obligation on them to keep an agent at Mobile or in Alabama. Considering the character of the contract, the circumstances under which it was entered into, the fact that Goodman was, with the knowledge of the defendants, a resident citizen of Alabama at all times, the fact that the contract must be regarded as having been entered into, and continued in operation by the defendants, at least as long as they themselves recognized its continuance, that is, until March 2d, 1862, with reference to, and in subordination, on their part, to such statute law of the state of Alabama as should be enacted on the subject of their keeping agents in that state, and the fact that the agency of McCoy, having been continued during the life of the policy up to March, 1861, was then withdrawn, it must, I think, be held, that the defendants were bound to keep in Alabama an agent to whom Goodman could pay his annual premiums, or could, at least, offer or tender payment, such agent to be appointed in conformity with such statute law, and that, if the absence of such agent was all that prevented the payment of such premiums by Goodman, the defendants are estopped from setting up the non-payment of such premiums at the times stipulated therefor as a defence to this suit.

The Alabama statute on the subject of foreign insurance companies, enacted February 24th, 1860, is in evidence in this case.

Its provisions are applied (section 1190) to life insurance companies not incorporated by the laws of the state of Alabama, whether such companies are or are not organized on the mutual plan. It provides (section 1180) that no agent of any such company shall take any risk or transact any business of insurance in Alabama, without first procuring a certificate of authority from the comptroller of the state; that, before obtaining such certificate, such agent must furnish to the comptroller a sworn statement showing the name and locality of the company, the amount of its capital stock, the amount of capital stock paid in, and the act incorporating it, and an instrument authorizing such agent to acknowledge service of process for and in behalf of the company, and consenting that service on such agent shall be taken to be service on the company; that no company incorporated by any other state, or any agent of it, shall transact any business of insurance, unless the company is possessed of at least $100,000 of actual capital invested in stock of at least par value, or in bond and mortgage on real estate worth double the amount for which the same is mortgaged; and that, on a compliance with these provisions, the comptroller shall issue a certificate thereof, with the authority to transact the business of insurance, to the agent applying for the same. It also provides (section 1182) that the agent, before taking any risks or transacting any business of insurance in the state, shall file in the office of the judge of probate of the county in which he may desire to establish an agency for the company, copies of the statement and instrument aforesaid. It also provides (section 1183) for the renewal annually of these proceedings. It also provides (section 1185) that every agent must annually deposit with the assessor of the county in which the agency is established, a sworn statement of the gross premiums received for insurance by the company at the agency during the preceding year. It also provides (section 1186) that such agent, before taking any risk or transacting any business of insurance, must pay certain local fees annually so long as the agency is continued. It also imposes (section 1188) a penalty of fine and imprisonment for the violation of the provisions of the law. It also provides (section 1191) that the provisions of the law shall apply when the risk is taken or any insurance business is transacted in Alabama by the agent of any company, whether the policies are signed by the officers of the company in or out of Alabama.

There can be no doubt that the passage of such a statute as this, was within the competence of Alabama. That state had a right to impose such terms and conditions as it chose, in granting its assent to the recognition of the defendants in Alabama, and of their rights under policies to be issued in Alabama to citizens and residents of Alabama, and to exact, in its discretion, such security as it thought proper, for the perform-

ance of the contracts of the defendants under such policies. It also had a like right to regulate the business of agencies of the defendants in Alabama, with reference to future payments to become due on existing policies issued in Alabama to citizens and residents of Alabama. Paul v. Virginia, 8 Wall. [75 U. S.] 168, 181. The policy in question was in fact issued in Alabama by the defendants, to a citizen and resident of Alabama, although it professes to have been delivered as well as signed by the president and secretary of the company. The receipt, by McCoy, of the premium paid at Mobile March 2d, 1861, such premium having been received by McCoy as agent, under the authority to that effect on the face of the policy, made the contract of insurance, as respected the period to elapse before March 2d, 1862 (even if, as contended by the defendants, such payment of premium created a new contract of insurance for a year), an Alabama contract, to be governed by the statute law of Alabama. Such receipt of such premium by McCoy was ratified by the defendants. I think the proper construction of the policy, as such policy stood when the payment to be made March 2d, 1862, became due, is, that, inasmuch as Goodman was then living, and the obligation of the defendants under the policy was outstanding, the defendants were bound to furnish Goodman with an opportunity, on the 2d of March 1862, and on every recurrence of the day of annual payment, to pay the premium to an agent of theirs in Alabama. As such payment to the agent would have been the transaction of insurance business in Alabama, the statute of that state required that the agency should conform to the statute. The defendants were bound to be ready to receive performance of the contract by Goodman through an agent in Alabama, such agent to be appointed in accordance with the Alabama statute. McCoy's agency in this case existed after that statute was passed. Such agency was withdrawn in March, 1861. Having been created before the war, it would not have been revoked by the war, at least so far as the right to receive payments of annual premiums was concerned. Payment of the premiums by Goodman to the agent would not have violated any law of war, or any duty of Goodman's. Ward v. Smith, 7 Wall. [74 U. S.] 447, 453; Conn v. Penn [Case No. 3,104]; U. S. v. Grossmayer, 9 Wall. [76 U. S.] 72, 75.

The evidence shows pecuniary ability and willingness on the part of Goodman to pay the premiums at Mobile, and that the reason why he did not pay them there was the absence of any agent there of the defendants. I see no legal objection to the evidence on this subject, either as competent, or as sufficient to prove the facts. If the defendants were entitled to the punctual payment of the premiums, as a condition precedent to their continuing liability from year to year, their prevention of such payment, by the with-

drawal of McCoy's agency, and of all other agencies in Alabama, excused Goodman from making the payments punctually, and debars the defendants from setting up such want of punctuality as a defence in this suit. Williams v. Bank of U. S., 2 Pet. [27 U. S.] 94, 102; Van Buren v. Digges, 11 How. [52 U. S.] 461, 479.

There is no force in the objection, that the defendants could not, during the war, have received from their agent in Alabama any moneys paid to him there as premiums, or that such moneys would have been confiscated in the hands of such agent, if paid to him. If the agent had been provided, Goodman could have tendered the premium, and the agent could have refused to receive it, because he could not remit it, and because it would be confiscated. The rights of Goodman would thus have been preserved, according to the tenor of the contract. The loss, if any, which would have ensued to the defendants, was a loss incident to the war, and with which Goodman had no concern, and the apprehension or certainty of which could not affect his rights. The unlawfulness of any receipt by the defendants at New York, from Goodman, or any other person in Alabama, during the war, of any moneys paid as premiums, cannot affect any rights of Goodman in respect of having the opportunity of paying such premiums in Alabama, or be set up by the defendants as a ground of forfeiture of the policy in respect of such rights.

Under these views, the contract was only suspended during the war. After the end of the war, the right of Goodman to pay the premiums which he had been prevented from paying by the action of the defendants, continued, in all respects, as if the 2d of March, 1862, had not passed. Within a reasonable time after the close of the war, that is, in January or February, 1866, and before the coming around of any 2d of March after the close of the war, an application on behalf of Goodman was made to the defendants at New York, requesting them to recognize the policy, on terms to be arranged. The reply of the defendants was, that they did not recognize the policy as valid, because it had been forfeited by the non-payment of premiums, and they refused to receive payment of the premiums in arrear. What thus transpired made it unnecessary for Goodman to tender the premium due March 2d, 1866. In December, 1867, after Goodman's death, an agent of the plaintiff presented to the defendants his claim on the policy, and tendered to them proofs of Goodman's death, and offered to pay any premiums that were in arrear. The reply of the defendants was, that the policy was forfeited, and they would recognize no liability upon it, and would not receive any premiums, or pay any loss upon it, but that they would, as a gratuity, pay what was the surrender value of the policy on the 2d of March, 1862.

The withdrawal of the agency of McCoy,

and of the other agencies in Alabama, made it unnecessary for Goodman to seek out McCoy or some other person who had been an agent of the defendants in Alabama, and tender the premiums, as due, to him, even though, as would appear from the evidence, McCoy remained in Alabama, accessible, during a part, at least, of the war. Especially is this so, in view of the fact that Goodman had notice of the revocation of McCoy's agency.

On all these considerations, I am of opinion that the defendants must be regarded as having prevented Goodman from paying his premiums, as due, in Alabama, where he had a right by the contract to pay them, and, therefore, as having waived such punctual payment; that the policy was not and is not forfeited by reason of the non-payment of premiums; that it is a valid and subsisting policy against the defendants; and that the plaintiff was, when he brought this suit, in a position to ask the relief prayed for by the bill.

These views recognize fully all the terms of the policy, and do not interpolate in the contract of the parties any provision, by way of excuse for the non-payment, on the stipulated day, of any premium, which is not within the terms of the contract. It is of the essence of every contract, that, if one party to it prevents its performance by the other party, the former cannot be allowed to reap any benefit from the fact of such non-performance. In this case, the prevention by the defendants of performance by Goodman was equivalent to actual performance by Goodman, or to a waiver by the defendants of such performance.

But, it is urged by the defendants, that Goodman could have paid his premiums at New York; that, if he elected to remain in Alabama, where he could not or would not make payment of the premiums, it was his own fault; and that the existence of the war and the prohibition of commercial intercourse between the state of Alabama and the city of New York furnishes no legal excuse for the non-compliance by Goodman with his agreement to pay the premiums on the designated days. Yet, the defendants insist, in the answer, that it was unlawful for them, between August 16th, 1861, and May 22d, 1865, to receive from Goodman any premium on the policy; and, on the argument, their counsel insisted, that, if Goodman had, after the 16th of August, 1861, offered to pay the premiums, as they fell due, it would have been unlawful for the defendants to receive such premiums. It was further insisted, that, notwithstanding this, the policy terminated because of such non-payment, for the reason that the intervention of the war, as an excuse for non-payment, was not provided for by the policy. But these arguments are without avail to support the defendants' case. Their inability to receive the premiums, when due, in 1862, 1863, 1864 and 1865, amounted to the same thing as if such pre-

miums had been actually tendered, and the defendants had refused to receive them. Such inability to receive was a dispensing by the defendants with the punctual payment of the premiums, and with their payment during the continuance of such inability, even if such payment be, under the terms of the policy, regarded as a condition precedent to the existence of the risk. Such inability was a default on the part of the defendants, preventing Goodman, a citizen and resident of Alabama, from paying the premiums to the defendants at New York, and, therefore, dispensing with the payment of them, as performance by Goodman. The case is not one where the excuse set up is merely inability or impossibility of performance on the part of him who is to perform. It is one where inability on the part of the party to whom performance was due, to receive such performance—an inability notorious and known to the party owing performance—existed, and is set up by the party to whom performance was due, as a ground for forfeiting the rights of the other party under the contract, because he did not pay what it was impossible and unlawful for his obligee to receive. The cases in the books, which were cited on the part of the defendants, as enforcing strictly the rule that a precedent condition on which, by contract, money is to be paid, must be absolutely complied with, were cases in which the impediment to performance existed solely on the part of him who was to be the actor in performance, and were not cases in which the impediment existed either solely on the part of him who was to be the recipient of performance, or was an impediment affecting both parties jointly, and equally in extent. The distinction is a sound one; and it would be gross injustice to apply to this case a rule the reason of which has no application to it. The defendants, in effect, say to Goodman: "It was unlawful for us to receive from you your premiums for 1862, 1863, 1864, and 1865, as they became due; it would have been idle for you to have tendered them to us; yet, as the contract was that you should pay them at specified times, and you did not pay or tender them at those times, the contract is forfeited, our liability to pay you the $5,983.05 is at an end, and, besides that, the $2,307.50 paid to us as premiums on the policies of 1849 and 1858 is forfeited to us." I do not believe a defence of that kind to a policy of life insurance situated like the present one, was ever allowed by any court of justice in any civilized community. I certainly shall not be the first judge to set a precedent of the kind. Indeed. it has often been held, that the intervention of the law will excuse non-performance of a contract, where the operation of the intervention was solely on the party who was to perform. and not at all on the party who was to receive performance. Wolfe v. Howes, 20 N. Y. 197, 201; Jones v. Judd, 4 Comst. [N. Y.] 411, 413; People v. Tubbs, 37 N. Y. 586, 588.

The views I have endeavored to maintain are concisely stated by the court in Manhattan Life Ins. Co. v. Warwick, before cited. In speaking of the obligation of the insurer, under the policy, to pay the sum insured, the court say: "The company could not relieve itself from this obligation, or subject the other party to a forfeiture, by refusing to receive payment of a premium, or by hindering or preventing the other party from paying it, or by any disability on its part to receive it, and which prevented the payment, which was not provided for in the contract." In the present case, the defendants are setting up their own disability to receive payment, as a ground of forfeiture. In New York Life Ins. Co. v. Clopton, before cited, the court say: "To subject to forfeiture all the premiums paid, as well as the five thousand dollars for the loss of life, would be harshly and unreasonably penal, for no better cause than the inevitable non-precise payment of another instalment of premium, which the law prevented the appellant from a right to receive. None of the parties can be presumed to have contemplated such disabling war, or to have intended, by the condition of avoidance, more than voluntary failure to pay, when there was legal ability to receive the premiums."

There was, therefore, no forfeiture in this case. Goodman continued to be insured in the defendants' company until his death, and was a member of the company at the time of his death. He was entitled, under the policy, at the time of his death, to all the rights, in respect of the sums insured by the policy, and of all proper increase of such sums insured, as the result of dividends made to members, up to the time of his death, which he could have been entitled to, if the defendants had received and accepted all the annual premiums specified in the policy. The resolution of February 22d, 1848, cannot be interpreted as applying, or having been intended to apply, to a case like the present one. Goodman did not "omit" to pay any premium, in the proper sense of that word. His failure to pay was wholly inactive and involuntary, and was no default on his part, but was, as between him and the defendants, the default of the defendants.

Nor is there any force in the view, that, Goodman being a partner with the other persons insured in the defendants' company, the partnership was dissolved by the war. The relation between him and such other persons, assuming that they were domiciled in New York during the war, because the company is a New York corporation, was not such a relation of partnership as requires the application to it of the rule that a war dissolves a contract of commercial partnership between enemies. The views before stated in regard to the effect of the war on the policy, as a contract between enemies. apply to it equally in its aspect as a policy issued by a company doing business on the mutual plan. The relations of Goodman to the partnership

and to his partners, and his duty to it and them, as a member, were created and are to be measured wholly by the terms of the policy, and no different rule can be applied to the policy, because it was issued by a mutual company, than would have been applied to it if it had been issued by a company of which the insured did not, by the insurance, become a member.

I have carefully considered all the views urged by the defendants, and am entirely satisfied that the plaintiff is entitled to a decree, with costs. There must be a reference to a master to take and state an account of the amount due on the policy, with interest, such amount to be computed on the basis before stated, and the defendants to be allowed credit for the unpaid annual premiums.

[On appeal to the supreme court of the United States, this decree was affirmed by a divided court, April 6, 1874 (case unreported), no reason being assigned, save the division of opinion.]